IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 06-cv-01858-RPM

KAREN LOUISE SAMPSON,
NORMAN FECK,
LOUISE SCHILLER,
TOM SORG,
WES CORNWELL, and
BECKY CORNWELL,

        Plaintiffs,

v.

MIKE COFFMAN, in his official capacity as Colorado Secretary of State,

        Defendant.

---

## MEMORANDUM OPINION AND ORDER
---

      The plaintiffs in this civil action seek declaratory and injunctive relief on their

claims that Colorado's regulation of political action under Article XXVIII of the Colorado

Constitution and the state's Fair Campaign Practices Act, implemented by rules and

regulations adopted by the Colorado Secretary of State, abridges the freedoms of

speech, peaceable assembly and to petition government for a redress of grievances

protected by the First Amendment, made applicable to the states by the Fourteenth

Amendment to the United States Constitution. After discovery, the parties filed cross

motions for summary judgment with corresponding briefs and exhibits. From the filed

papers, the following Statement of Facts is not disputed.

STATEMENT OF FACTS

The plaintiffs in this civil action live in a residential developed area of unincorporated Douglas County, Colorado, known as Parker North, adjacent to the Town of Parker. Another resident of Parker North, J. David Hopkins, initiated an effort to annex Parker North to the Town of Parker by circulating a petition to the Town Council to call an annexation election. At a Town Council meeting, on February 21, 2006, Hopkins addressed the subject of the proposed annexation. The plaintiffs Karen Sampson, Norman Feck and Tom Sorg were among many residents of Parker North in attendance at the meeting.

Feck immediately wrote a letter to the Mayor, dated February 21, 2006, objecting to the proposed annexation, expressing concern about the procedures being followed and expressing his opinion that the majority of the residents of the neighborhood opposed annexation. Feck sent copies of that letter to every Parker North household. Exhibit A-4. Sampson responded to Feck's letter by her letter of February 27, 2006, sharing some of the same concerns about the petitioning process. Exhibit A-5.

Sampson, Feck and Sorg coordinated efforts to develop neighborhood opposition to the proposed annexation. Those efforts included house to house direct contacts to discuss the issues. The plaintiff Louise Schiller joined in that effort as did plaintiffs Wes and Becky Cornwell. Wes Cornwell owned a printing business and printed "No Annexation" signs to be sold to Parker North residents at cost. Sorg and a neighbor developed a Yahoo! e-mail discussion group open to all Parker North residents. The

plaintiffs also communicated regularly among themselves to organize opposition to the petition.

After Sorg learned that the petition circulated by Hopkins permitted signers to withdraw their signatures, Sampson prepared and circulated a form for that purpose. Enough signers of the petition withdrew their signatures to result in the declaration by the Parker Town Clerk's Office on March 23, 2006, that the annexation petition was invalid for lack of signatures.

Another Parker North resident, Patsy Putnam, favored annexation and joined with Hopkins to circulate a second petition to the Town Council to proceed with an election. They gave newspaper interviews, printed signs, created a website, talked to neighbors and held a rally. Hopkins, an attorney, learned from a Parker Town Council member that Colorado law provided for the formation of an issue committee. Hopkins conducted legal research on the Colorado campaign finance laws and on May 9, 2006, he and Putnam registered as an issue committee under the name "ParkerYes" with the Douglas County Clerk and Recorder. The second petition for an annexation election was submitted to the Town of Parker on May 16, 2006.

All of the plaintiffs sent a letter to the Mayor and Town Council members, dated June 12, 2006, questioning the validity of signatures on the petition and informing that 215 neighbors had signed an opposition to annexation. Exhibit A-40. Feck and Schiller submitted a "protest" to the Town Clerk on June 16, 2006, challenging the sufficiency of the petition. Exhibit A-41. At a meeting on June 19, 2006, the Town Council scheduled

an official meeting for August 14, 2006, to decide whether to proceed with an election

on the issue of annexation of Parker North.

On July 3, 2006, Putnam, represented by Hopkins as her attorney, filed a

"Request for Hearing and Complaint," with the Colorado Secretary of State, naming the

plaintiffs as respondents with the following allegations.

## FIRST ALLEGATION

4.  Patsy Putnam is a resident, qualified elector and landowner over the age of 18 in Parker North, Colorado, unincorporated Douglas County.

5.  She has witnessed a ballot issue or question being promoted and opposed, concerning an election to annex Parker North, unincorporated County of Douglas, into the Town of Parker, Colorado County of Douglas.

6.  The Respondents named in this complaint have opposed this ballot issue or question and are a group of two or more persons that has a major purpose of supporting or opposing any ballot issue or ballot question.

7.  That the group of Respondents has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or question.

8.  The Respondents form an Issue Committee as defined in Art XXVIII (10), Colorado Const.

## SECOND ALLEGATION

9.  Complainant incorporates the above allegations as though fully set forth herein.

10.  The Respondents have failed to register the Issue Committee as required under CRS 1-45-108(3) and Campaign and Political Finance Rule 3.1.

11.   Respondents have failed to set up a separate bank account in the Issue Committee's name and separate tax ID number as required under Art XXVIII Section 3(9), and other violations of Art XXVIII, sections 3(10) & (11).

12.   Respondents have accepted contributions or made expenditures prior to registering contrary to CRS 1-45-108(3).

13.   Respondents have failed to comply with reporting requirements of CRS 1-45-108, 109 and CPF Rule 4.2.

14.   These illegal activities have been on-going and continuous for many months, despite repeated warnings, thus exposing all persons who have contacted or obtained campaign materials from the Respondents with possible investigation, scrutinization [sic] and sanctions for Campaign Finance violations.

Exhibit A-50.

At the complainant's request, subpoenas were issued to each respondent to

compel attendance at a hearing on July 18, 2006, and to produce the following:

All evidence of sales, purchases, gifts or any transfers of any materials concerning annexation of Parker North into the Town of Parker, Colorado, including signs, banners or campaign materials, showing the item, the amount contributed or expended, the fair market value of each such item and whether it was sold, gifted or otherwise transferred, listing the type of transfer.

Names, addresses and telephone numbers for all persons who are or may be members of the Respondent's issue committee or group.

Names, addresses and telephone numbers for all persons sold, gifted, or transferred signs, banners or any campaign information.

All evidence concerning amounts contributed and expended on the issue of annexation of Parker North into the Town of Parker, Colorado.

All bank account information concerning contributions, expenditures or campaign materials on the issue of annexation of Parker North into the Town of Parker, Colorado.

All issue committee registration information concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

All reports made or due to any entity, including the Colorado Secretary of State, concerning the issue committee of Respondents or about the issue of annexation of Parker North into the Town of Parker, Colorado.

All communications amongst the Respondents or anyone else concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

Examples of all information or campaign materials sold, gifted or transferred to anyone concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

Exhibit 9.

The complaint was referred to an Administrative Law Judge ("ALJ"). The plaintiffs were surprised by this filing and the subpoenas issued to them, apparently having no prior knowledge of the Colorado law regarding the formation of an issue committee. They retained counsel and on her advice registered as an issue committee on July 16, 2006, as "No Annexation," listing Becky Cornwell as the registered agent. By letter dated July 21, 2006, Hopkins, as Putnam's lawyer, submitted a "non-negotiable offer" to settle if the plaintiffs signed a "Stipulation and Guilty Plea." Exhibit 11. It required an admission of guilt as to all charges in the complaint and full compliance with the law before July 28, 2006, or abandoning the group opposing annexation and removal of all signs and campaign material. Exhibit 10.

After an informal pre-hearing conference on August 9, 2006, the ALJ issued an Order to Show Cause on August 10, 2006, observing that as of that time there was no ballot issue or ballot question because the Town of Parker had not fixed a ballot title and directing the parties to show cause why the complaint should not be dismissed. Exhibit A-86.

The respondents argued for dismissal because there was no ballot issue or ballot question when the complaint was filed.

At the scheduled meeting on August 14, 2006, the Town Council adopted Resolution No. 06-068, making findings of fact and conclusions as to eligibility of the Parker North subdivision property for annexation into the Town of Parker, as required by C.R.S. § 31-12-110; setting the terms and conditions for annexation of the property; and directing the filing of pleadings with the district court pursuant to C.R.S. § 31-12-112. Exhibit A-90, pp. 0018-0024. The resolution described the property to be annexed by metes and bounds.

By an order entered August 28, 2006, the ALJ decided to proceed and scheduled a hearing on the Putnam complaint for September 20, 2006. During that hearing, the respondents and Putnam agreed to a settlement in the form of a Stipulation and Entry of Judgment. After acknowledging that they were making no determination regarding the existence of a ballot issue or ballot question on or before August 14, 2006, Putnam and the respondents agreed as follows:

1.   Assuming, for the purposes of this Stipulation and Entry of Judgment only, that there was a ballot issue or ballot question as those terms are used in Article XXVIII §2 (10)(a) on or before June 2, 2006, the Respondents met the definition of issue committee under Article XXVIII §2 (10)(a) as of June 2, 2006.

2.   This Entry of Judgment shall be with prejudice as to any possible violations of the aforementioned laws by Respondents prior to July 16, 2006.

3.   No fines, penalties, attorney's fees, or other sanctions shall be imposed against either party or their counsel.

Exhibit A-52.

The Town filed the petition for an annexation election for Parker North with the District Court, Douglas County, Colorado, on October 9, 2006.  On October 24, 2006, the court entered an order appointing election commissioners with direction to call an election pursuant to C.R.S. § 31-12-112.  Exhibit A-91.  On December 14, 2006, the commissioners published the first Notice of Annexation Election to be held on February 6, 2007, containing a legal description and the condition that zoning will be SR - Suburban Residential District as defined in the Parker Land Development Code.  Exhibit A-93.  At the election held on that date, the annexation was defeated by a vote of 352 to 21.

During the time between the filing of the Putnam complaint and the annexation election, the plaintiffs, Hopkins and Putnam published their comments on a website called "YourHub.com."  They vigorously debated the pros and cons of the proposed annexation.  The plaintiffs publicly accused Putnam and Hopkins of using Putnam's

administrative complaint as part of an effort to silence the opposition and intimidate supporters by suggesting in paragraph 14 of the complaint that all persons who have contacted or obtained campaign materials from the respondents were exposed to "possible investigation, scrutinization [sic] and sanctions" for campaign finance law violations.

THE LAW

Article XXVIII was added to the Colorado Constitution by a majority of the voters at the general election in November, 2002, approving a ballot question placed by a citizen initiative. Section 1 of that article states its purpose as follows:

> The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption; that large campaign contributions made to influence election outcomes allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process; that the rising costs of campaigning for political office prevent qualified citizens from running for political office; that because of the use of early voting in Colorado timely notice of independent expenditures is essential for informing the electorate; that in recent years the advent of significant spending on electioneering communications, as defined herein, has frustrated the purpose of existing campaign finance requirements; that independent research has demonstrated that the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy; that political contributions from corporate treasuries are not an indication of popular support for the corporation's political ideas and can unfairly influence the outcome of Colorado elections; and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

Article XXVIII repeatedly incorporates by reference the Colorado Fair Campaign Practices Act ("FCPA"), C.R.S. §§ 1-45-101 *et seq.,* which had been repealed and reenacted by a citizen initiative in 1996. In 2002, after intervening changes, the statute regulated "issue committees" defined as "two or more persons who are elected, appointed, or chosen, or have associated themselves, for the purpose of accepting contributions and making expenditures to support or oppose any ballot issue or ballot question." C.R.S. § 1-45-103(8)(a)(I). The FCPA required issue committees to report contributions, including the name and address of persons contributing $20.00 or more, and expenditures. It required issue committees to register before accepting or making any contributions and provided that violators would be subject to civil penalties.

Article XXVIII § 2 provided a new definition of issue committee as follows:

> (10)(a) "Issue committee" means any person, other than a natural person, or any group of two or more persons, including natural persons:
>
>> (I)That has a major purpose of supporting or opposing any ballot issue or ballot question; or
>>
>> (II) That has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question.
>
> (b) "Issue committee" does not include political parties, political committees, small donor committees, or candidate committees as otherwise defined in this section.
>
> (c) An issue committee shall be considered open and active until affirmatively closed by such committee or by action of the appropriate authority.

Article XXVIII establishes contribution limits for candidates and the committees and political parties supporting them (Section 3); provides for voluntary campaign spending limits by candidates (Section 4); provides for notice filing by persons making independent expenditures in excess of $1,000.00 per year in support of candidates (Section 5); requires reporting of electioneering communications of $1,000.00 or more per year referring to candidates (Section 6) and imposes the following disclosure requirement in Section 7.

The disclosure requirements relevant to candidate committees, political committees, issue committees, and political parties, that are currently set forth in section 1-45-108, C.R.S., or any successor section, shall be extended to include small donor committees. The disclosure requirements of section 1-45-108, C.R.S., or any successor section, shall be extended to require disclosure of the occupation and employer of each person who has made a contribution of one hundred dollars or more to a candidate committee, political committee, issue committee, or political party. For purposes of this section and 1-45-108, C.R.S., or any successor section, a political party shall be treated as separate entities at the state, county, district, and local levels.

The statutory disclosure requirements referred to include the following:

(3) Except as otherwise provided in subsection (3.5) of this section, all candidate committees, political committees, issue committees, small donor committees, and political parties shall register with the appropriate officer before accepting or making any contributions. Registration shall include a statement listing:

(a) The organization's full name, spelling out any acronyms used therein;
(b) A natural person authorized to act as a registered agent;
(c) A street address and telephone number for the principle [sic] place of operations;
(d) All affiliated candidates and committees;
(e) The purpose or nature of interest of the committee or party;

(f)   Any intent of the candidate committee, political committee, issue committee, small donor committee, or political party to electronically file reports required by this article that may be filed electronically on a web site operated and maintained by the secretary of state pursuant to section 1-45-109.

C.R.S. § 1-45-108(3).

Throughout the language of Article XXVIII, the references to the statute include "any successor section."  The Colorado General Assembly amended the Fair Campaign Practices Act in 2002 to conform to Article XXVIII.  The definition of issue committee was therefore replaced with the definition in Article XXVIII § 2(10).  C.R.S. § 1-45-103(12).  The legislative declaration of purpose in the statute (§ 1-45-102) corresponds to that in Article XXVIII.

The place of registration for an issue committee is set by § 1-45-109 according to the scope of the issue on the ballot.  If the ballot issue affects more than one county, the filing is with the secretary of state.  In this case, the filing required was with the clerk and recorder of Douglas County.

An issue committee is required to deposit in a separate bank account in a financial institution all contributions it receives, Art. XXVIII § 3(9), and must file reports of the contributions received, listing the name and address of each person who has contributed $20.00 or more, all expenditures made, and all obligations entered into by the committee.  For contributions of $100.00 or more, the disclosure must include the person's occupation and employer.  C.R.S. § 1-45-108(1).

C.R.S. § 1-45-108(2)(a)(II) provides as follows:

> (II) Such reports that are required to be filed with the county clerk and recorder or with the municipal clerk shall be filed on the twenty-first day and on the Friday before and thirty days after the primary election, where applicable, and the major election in election years and annually in off-election years on the first day of the month in which the anniversary of the major election occurs.

The term "major election" is defined in subpart III as the election that decides "an issue committee's issue."

The reports must include the balance of funds at the beginning of the reporting period, the total contributions received and expenditures made during the reporting period, and the name and address of the financial institution used. *Id.* at Subpart IV. These reports are public records open to inspection.

Enforcement of these registration and reporting requirements is provided for in Subsection 2 of Section 9 of Article XXVIII as follows:

> (a) Any person who believes that a violation of section 3, section 4, section 5, section 6, section 7, or section 9(1)(e), of this article, or of sections 1-45-108, 1-45-114, 1-45-115, or 1-45-117 C.R.S., or any successor sections, has occurred may file a written complaint with the secretary of state no later than one hundred eighty days after the date of the alleged violation. The secretary of state shall refer the complaint to an administrative law judge within three days of the filing of the complaint. The administrative law judge shall hold a hearing within fifteen days of the referral of the complaint, and shall render a decision within fifteen days of the hearing. The defendant shall be granted an extension of up to thirty days upon defendant's motion, or longer upon a showing of good cause. If the administrative law judge determines that such violation has occurred, such decision shall include any appropriate order, sanction, or relief authorized by this article. The decision of the administrative law judge shall be final and subject to review by the court of appeals, pursuant to section 24-4-106(11), C.R.S., or any successor section. The secretary

of state and the administrative law judge are not necessary parties to the review.  The decision maybe [sic] enforced by the secretary of state, or, if the secretary of state does not file an enforcement action within thirty days of the decision, in a private cause of action by the person filing the complaint.  Any private action brought under this section shall be brought within one year of the date of the violation in state district court.  The prevailing party in a private enforcement action shall be entitled to reasonable attorneys fees and costs.

. . . .

      (c) A subpoena issued by an administrative law judge requiring the production of documents by an issue committee shall be limited to documents pertaining to contributions to, or expenditures from, the committee's separate account established pursuant to section 3(9) of this article to support or oppose a ballot issue or ballot question.  A subpoena shall not be limited in this matter where such issue committee fails to form a separate account through which a ballot issue or ballot question is supported or opposed.

Section 10 of the Article establishes civil penalties for violations of the constitutional provisions and the statute.

In determining the issues raised by the competing motions for summary judgment, this court is constrained by fundamental principles of constitutional law.  First, under the division of powers in the federal structure of the United States Constitution, the states have plenary power to regulate the time, place and manner of elections.  Second, that power must be exercised within the limitations of the First Amendment.  Third, court intervention to invalidate a state election law by ruling it unconstitutional must be shown to be necessary for the protection of the freedoms protected by that amendment.  Finally, the court has a duty to apply the challenged law in a manner which avoids constitutional conflict if it can do so without distorting the statutory language and by applying state rules of construction.  *Citizens For Responsible*

*Government State Political Action Committee v. Davidson,* 236 F.3d 1174 (10th Cir. 2000).

The plaintiffs have made a facial challenge to Colorado's campaign finance laws. That must be rejected. The Supreme Court in the recent opinion deciding *Washington State Grange v. Washington State Republican Party,* 128 S. Ct. 1184 (2008) reemphasized the established rule that a facial challenge can succeed only if the law is unconstitutional in all of its applications. That case has not been made by the plaintiffs in the broad context of campaigns for political office or proposals presented by the initiative or referendum. As will be explained, the application of the challenged campaign finance laws to a municipal annexation election raises issues that are different from the ballot issues and ballot questions at elections that are expressly within the scope of the requirements for registration, reporting and disclosure.

At the hearing on the motions for summary judgment, the court suggested that the North Parker annexation election was not within the coverage of the challenged laws and regulations. The parties agreed that it was. After argument, the court made its independent textual analysis in an Order for Supplemental Briefing, entered May 20, 2008. The parties responded, disagreeing with the court's suggested analysis. The court is not constrained by those responses because it has an independent duty to determine the existence of a constitutional issue.

Article XXVIII does not contain a definition of a "ballot issue" or "ballot question." Section 9 requires the secretary of state to promulgate rules to implement the

constitutional and statutory requirements and the Secretary has done so.  Rule 1.6 defines a ballot issue or ballot question by incorporating the definitions in the FCPA, C.R.S. §§ 1-1-104(2.3) and (2.7).  Section 1-1-104(2.3) defines "ballot issue" to be a state or local government matter arising under Section 20 of Article X of the State Constitution, as defined in the election laws, §§ 1-41-102(4) and 1-41-103(4).  Section 1-41-102(4) refers to state ballot issues for elections in odd years and § 1-41-103(4) refers to local ballot issues in local elections held in odd numbered years.  It appears, therefore, that the North Parker annexation election was not a "ballot issue" under Colorado law.

Whether there was a "ballot question" is addressed in § 1-1-104(2.7), defining it as a state or local government matter involving a citizen petition or referred measure, other than a ballot issue. The word "ballot" is defined in § 1-1-104(1.7) as the list of all candidates, ballot issues, and ballot questions upon which an eligible elector is entitled to vote at an election.

Following this textual analysis, it appears that the earliest time that the constitutional and statutory requirements would be applicable to these plaintiffs was when the commissioners appointed by the District Court published a notice of election as directed by § 31-12-112(6).  That was December 14, 2006.  The time for filing disclosure reports is keyed to the date of the election set by that notice.

Annexations in Colorado are governed by the Municipal Annexation Act of 1965, C.R.S. §§ 31-12-101-123.  There are statutory standards of eligibility for annexation

established by § 31-12-104 with limitations in § 31-12-105.  A proposal for annexation may be presented to any municipality by two alternative methods.

A petition for annexation may be filed with the municipal clerk signed by the landowners of more than 50% of the area with a legal description of the property and other requirements.  The governing body, upon determining that the landowners' petition complies with the statutory requirements, may proceed with a hearing, after filing an impact report with the board of county commissioners as required by § 31-12-108.5.  The clerk of the municipality must give notice of the hearing by publication of a copy of the petition or resolution setting the hearing, along with other information, in a newspaper of general circulation in the area to be annexed.  Any person may appear and present evidence at the hearing.  C.R.S. § 31-12-109.  After hearing, the governing body must make findings of fact and reach a conclusion that the proposal meets all statutory requirements in a resolution which will include the terms and conditions it will impose on the annexation.  C.R.S. § 31-12-110.  Annexation is accomplished by passage of an ordinance.  Judicial review by the district court is available to any landowner, or qualified elector in the annexation area, the county commissioners and any other municipality within one mile of that area.  C.R.S. § 31-12-116.

The alternative procedure is by a petition for an annexation election signed by at least 75 qualified electors or at least 10% of qualified electors, whichever is less, in counties with more than 25,000 inhabitants, requesting the municipality to commence proceedings for holding an annexation election.  C.R.S. § 31-12-107(2).  Those

proceedings include a public hearing under § 31-12-108 after an impact report to the county with the requirement for findings in the same manner as a landowner's petition for annexation as described above.

The procedure for calling an annexation election is prescribed by § 31-12-112. The municipality must petition the district court which then appoints three commissioners to conduct the election. The notice of election published in a newspaper of general circulation must include a description of the boundaries of the area to be annexed and the terms and conditions set by the governing body, such as the zoning of the property to be annexed. The statute directs that the ballot shall contain the words "For Annexation" and "Against Annexation." If a majority of the votes cast are against annexation, the court shall order that all annexation proceedings to date are void and the governing body shall not proceed further. C.R.S. § 31-12-112(9). The definition of "qualified elector" in this statute is "a registered elector, as defined in part 1 of article 1 of this title, who is a resident landowner of the area proposed to be annexed." C.R.S. § 31-12-103(9). The cross reference is registered voters under the Municipal Election Code of 1965.

C.R.S. § 31-12-112(2) provides that "any landowner owning land in the area proposed to be annexed may vote, irrespective of whether he is a qualified elector." That same subsection authorizes a corporate landowner to vote by an officer designated by a corporate resolution. There is a seeming inconsistency between this eligible voter provision and C.R.S. § 31-12-112(1) providing that the annexation election

is to determine "whether a majority of the qualified electors approve such annexation, with such terms and conditions, if any, as may attach thereto."

In *City of Aspen v. Howell,* 459 P.2d 764 (Colo. 1969), an annexation election approving an annexation to the City of Aspen was challenged on several grounds. A petition for direct annexation had been filed before the filing of a petition for an annexation election. The city had found that the first petition met the statutory requirements and set a date for the required public hearing. At that scheduled hearing the city council passed a resolution approving the petition for an election. The Colorado Supreme Court rejected an argument that the petition for an election required a new hearing because the matters to be inquired into and the findings to be made were substantially the same for both petitions.

The challenger also contended that nonresident landowners should not have been entitled to vote. The court held to the contrary, as follows:

> Howell has assigned cross-error to the trial court's ruling that nonresident landowners of the territory to be annexed are entitled to vote in annexation elections. The terms of the Annexation Act, Section 11(1)(c) provide that an election shall be called to determine whether a majority of the 'qualified electors residing within the territory' approve such annexation. But Section 11(2) provides that any 'landowner owning land' in the territory may vote, 'irrespective of whether he is a qualified elector' (emphasis added). 'Landowner' means the owner in fee of any undivided interest in a given parcel of land. Annexation Act, 139-21-21(8). 'Qualified elector,' on the other hand, means a 'resident landowner' (emphasis added). Annexation Act, Section 21(10). Another pertinent section provides that the commissioners shall forthwith call an election of 'all the qualified electors, or qualified electors and landowners***.' Annexation Act, Section 11(5).

In view of the specific provision in Section 11(2) that a landowner may vote irrespective of whether he is a qualified elector, which entails residency, and the further recognition in Section 11(5) that qualified electors and landowners may be two separate groups, both entitled to vote, we conclude that the legislature intended to permit a nonresident landowner to vote in an annexation election. A contrary construction could render the entire statute void for lack of equal protection, for it expressly provides in Section 11(2) that 'any corporate landowner' may by resolution designate one of its officers to cast its votes. In accord with familiar rules of statutory construction, the specific provisions must be held to prevail over the general provisions. To the extent that this construction conflicts with the residency requirements of the Municipal Election Code, those provisions are held to be superseded by the provisions of the Annexation Act.

*Id.* at 767-68.

Accordingly, the "electorate" for an annexation election is different from the electorate for Colorado's other election laws. The requirement of land ownership for residents and the inclusion of non-resident landowners as electors are in recognition that a proposed annexation affects property interests. The Colorado legislature has added protection of property to the core freedoms protecting the political process in annexation elections. Limiting the vote to landowners permits them to determine whether their ownership will be enhanced or diminished by incorporation of their property into the municipality under the terms and conditions set by the resolution authorizing the election and included in the notice of election. Land ownership would not be a permissible qualification to vote in the election of candidates for public office.

This difference in the electorate has legal significance in balancing the competing interests required by established constitutional law applicable to governmental

restrictions on individual liberty protected by the First Amendment. The formulation of the analytical framework for determining the validity of campaign finance laws has been driven by the factual contexts in which the issues developed. The Supreme Court and the Tenth Circuit Court of Appeals have been guarded in avoiding any impulse to establish clear lines of demarcation between the individual and collective interests in the conduct of elections, giving due deference to the democratic processes by which the restrictions were imposed.

The collective interest must be identified as a governmental purpose sufficient to outweigh the protected private interests. When the restrictions are contained in legislation enacted by the general assembly, the purposes are explained by legislative findings with a legislative history of the deliberative process. The purpose of a constitutional amendment, enacted by the approval of a ballot question by a majority of those voting on a citizen initiative can only be discerned from the language of the amendment. Adjudication of First Amendment challenges ordinarily requires weighing the relative importance of the freedoms protected by the First Amendment and the governmental purposes said to be served by the restrictions on those freedoms. Generalizations are difficult as is the distinction between issues of fact and conclusions of law in the context of motions for summary judgment. An additional complication arises from recognition of the combination of individual and associational interests involved in the electoral process.

Limitations on contributions to candidates for political offices have been better accepted than restrictions on expenditures in that the latter have more impact on both the content and quantity of speech.

That distinction was made clear by the Supreme Court in the *per curiam* opinion in *Buckley v. Valeo,* 424 U.S. 1, 19-23 (1976). The Court also recognized that because disclosure requirements can infringe on the protections of privacy of association and belief guaranteed by the First Amendment, justification for them requires a showing of more than a mere legitimate governmental interest, and a correlation between that governmental interest and the information required to be disclosed. *Id.* at 64. These general principles have been consistently recognized in all of the subsequent cases but their application depends upon many factors in the varying contexts in which the legal disputes arise as shown by the multiple opinions of the justices addressing the particular provisions of the Federal Election Campaign Act of 1971 in *Buckley* and in the many subsequent cases arising under both federal and state laws.

The Secretary promulgated Rule 1.6, effective on November 30, 2007. Rule 1.6 provides:

"Issue", as used in Article XXVIII of the Colorado Constitution and Article 45 of Title 1, C.R.S., shall mean a "ballot issue" or "ballot question" as such terms are defined in section 1-1-104(2.3) and (2.7), C.R.S. For the purposes of Article XXVIII, section 2(10) of the Colorado Constitution, a matter shall be considered an "issue" at the earliest of the following:

a.   It has had a title designated and fixed in accordance with law;

b.   It has been referred to the voters by a governing board or the general assembly;

c.   In the case of a citizen referendum petition, it has been submitted for formal approval in accordance with the law;

d.   A petition has been circulated and signed by at least one person; except that, where a matter becomes an "issue" upon such signing, a person or persons opposing such issue shall not be considered an "issue committee" until one such person knows or has reason to know of the circulation; or

e.   A signed petition has been submitted to the appropriate election official in accordance with law.

8 C.C.R. 1505-6, § 1.6.  Ex. A-1.

The defendant argues that the new rule is consistent with the ruling by the Colorado Court of Appeals in *Colorado For Family Values v. Moyer*, 936 P.2d 631 (Colo. App. 1997), holding that a citizen initiative that has gone through the title setting process but has not yet been formally certified for the election ballot is an "issue" under the definition in the Campaign Reform Act of 1974 requiring registration and reporting of a committee opposing the petition being circulated.

That opinion is neither compelling nor persuasive.  The citizen initiative to propose laws and amendments to the state constitution is a power reserved to the people in Article V, Section 1 of the Colorado Constitution.  The procedure for the exercise of that power includes the fixing of a ballot title.  That is the step that the court deemed decisive.  Article V also provides for the initiative and referendum power in the

electors of every city, town and municipality as to local legislation.  Thus, the issue framed by a ballot title is a part of an established election procedure in the same manner as the election of candidates for public office.

A petition for an annexation election is qualitatively different.  It is a request to the governing body to consider a proposal for annexation which is a matter within its discretion.  Here, the Parker Town Council was not required to proceed with an annexation election.  That was the subject of the public hearing on August 14, 2006.  The Town Council was free to deny the petition at that time.  It also was free to set the terms and conditions for annexation.  Accordingly, by textual analysis there was no ballot question until the vote of the Town Council to proceed on August 14, 2006, at the earliest.

A more logical conclusion is that the proposed annexation of Parker North became a ballot question by the publication of the notice of election on December 14, 2006.

As noted in *City of Aspen*, the issues to be determined by the Town Council at the August 14, 2006, meeting were the same as those which would have been before it if the petition had been for direct annexation by ordinance.  Thus, the efforts of the plaintiffs and those allied with them to persuade the council members to reject the Putnam petition were not a part of any electoral process.

The plaintiffs now agree with the defendant's contention that the North Parker annexation became a ballot question by May 16, 2006, at the latest, when the Putnam

petition was filed. They acknowledge that they took a contrary position before the ALJ hearing, but suggest that the Secretary's adoption of Rule 1.6 has resolved the question, just as would be the result of an intervening Colorado court decision and this court should defer to the Secretary's determination of state law. The plaintiffs are concerned that a different view would affect their standing in this case. They need not have that concern. Standing has been established by the application of this law to them and all parties agree that the legal questions have not become moot. What is at stake in this matter of language interpretation is the application of established constitutional law limiting restrictions on First Amendment freedoms to those which meet the requisite governmental purposes as first announced in *Buckley, supra.*

The parties suggest that in the absence of agreement with their views concerning interpretation of the constitutional and legislative language, this court should certify the question to the Supreme Court of Colorado pursuant to C.A.R. 21.1. That is not necessary because it is to be expected that the court would proceed as it did in *Common Sense Alliance v. Davidson,* 995 P.2d 748 (Colo. 2000), giving the definition of "issue committee" then contained in the FCPA a narrow reading to avoid conflict with constitutional protections of freedom of speech and freedom of association.

Those fundamental freedoms are directly implicated if the state law requirements of registration, reporting and disclosure were applicable to these plaintiffs when they first began their activities opposing the Putnam petition while it was being circulated as charged in the Putnam complaint.

In *Citizens For Responsible Government State Political Action Committee v. Davidson, supra*, the Tenth Circuit Court of Appeals invalidated portions of a previous version of Colorado's Fair Campaign Practices Act as failing to withstand strict scrutiny justifying restrictions they imposed on First Amendment freedoms. The opinion is significant here as it recognized the distinctions between issue advocacy and candidate advocacy as well as those between limitations on expenditures contrasted with contributions made by the Supreme Court in *Buckley* and subsequent decisions.

If the FCPA became applicable to these plaintiffs before publication of the notice of election, it is difficult to determine the date on which compliance was required. Under Article XXVIII and Rule 1.6, when Sampson told Feck of her support of his February 21, 2006, letter to the mayor, copied to the residents of Parker North, did the two of them become an issue committee? When Wes Cornwell began printing signs, was he making a contribution that required reporting? Were any residents who purchased signs at a cost of $20.00 or more contributors who must be reported?

The breadth of this restriction on citizens' freedoms to associate and communicate is not supportable by any rational governmental purpose. There is no principled basis for distinguishing these efforts to avoid annexation of their property from any other opposition to proposed action of representative government by the legislative process. If the issue before the Parker Town Council were a change in zoning restrictions, the placement of a stop light, or the imposition of a speed limit on city streets, it would be readily apparent that any attempts to silence or restrict public

opposition to it would infringe the protection of core political speech provided by the First Amendment.

It is noteworthy that Putnam and Hopkins began their joint efforts to support annexation well before they registered as "ParkerYes."   Registration was required under Article XXVIII when the two of them began circulating the petition for an annexation election.  There is a contradiction in the Secretary's rules in that § 1-45-108(3) prohibits accepting or making contributions before registration and Rule 1.7 requires registration if contributions or expenditures exceed $200.00.

The defendant has alluded to the sovereign power of the people in suggesting that in the exercise of the initiative, the citizens are acting as their own legislators and that the requirements imposed by Article XXVIII are akin to restraints on lobbyists.  The analogy is not apt.

Article II, Section 1 of the Colorado Constitution provides that:

> All political power is vested in and derived from the people; all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.

That reservation of power is consistent with the Tenth Amendment of the United States Constitution.

While the power of the people may be exercised directly through the initiative in accordance with Section 1, Article V, the will of a transient majority of qualified electors voting on a measure proposed by that process must not be construed as a yielding of the power of all of the people to express themselves freely before, during and after the

completion of the process.  There is no separation between legislators and lobbyists in the exercise of direct democracy.

The danger of corrupting the elected representatives of the people in the General Assembly by the largess of lobbyists is not present when the citizenry exercise the power of the initiative or the referendum.

The most salient purpose to be served by campaign finance laws is the protection of the integrity of the electoral process to instill confidence in the outcome as the expression of the people's will free from the corrupting influence of money.  The nobility of that purpose cannot be denied.  A different form of corruption is made possible by restrictions that are so disproportionate to the evil sought to be prevented that those restrictions can be manipulated to impose such financial burdens as may effectively silence the voices of those who seek to debate the issue.  That is true not only as to the restrictions themselves but also in the manner of enforcement.

As will be seen, the use of private complaints as the primary method of enforcement of Colorado's fair campaign practices laws aggravates the damaging effects of the substantive limitations on the freedoms of speech and assembly.

The Supreme Court in *New York Times v. Sullivan,* 376 U.S. 254 (1964), held that a private civil action for defamation of a public official against citizens criticizing government conduct in a paid newspaper advertisement could not be sustained absent actual malice because of its chilling effect on their First Amendment freedoms.  The state's power to award damages for defamation was constrained by the principle that

"debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.

The protection of speech on matters of public concern was extended to defamation claims by "private figures" in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986). There, the Court reversed a state court that followed the traditional rule imposing the burden of proving the truth of a defamatory statement on the defendant which published allegations that the principal stockholder of a corporation used links to organized crime to influence state government. Writing for the majority, Justice O'Connor reviewed the cases since *New York Times v. Sullivan* and held that when the speech is on a matter of public concern and affects the reputation of a private person, the Constitution supplants the common law by changing the burden of proof to require the plaintiff to prove falsity "[t]o ensure that true speech on matters of public concern is not deterred." *Id.* at 776. The Court recognized that a plaintiff may not be able to prove falsity but accepted that the private litigant's loss of a merits case was necessary to protect a media defendant from the fear that liability may result from its publication. The emphasis under the First Amendment is on the value of speech on matters of public concern.

When the enforcement of government regulations on speech is in the hands of government officials, the Court has examined the breadth of the regulation to determine whether it permits such unrestrained discretion as would permit viewpoint

discrimination, censorship or other improper motivation. *E.g., City of Houston, Texas v. Hill,* 482 U.S. 451 (1987); *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988) and the many cases concerning the licensing of purveyors of adult entertainment; *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986).

Colorado has not established any requirements for a complaint filed under Article XXVIII, Section 9(2)(a). Any person who believes that there has been a violation of the Article's sections may file a written complaint with the secretary of state any time within 180 days after the date of the alleged violation and the secretary of state must refer the complaint to an administrative law judge within three days of the filing, without any review of its sufficiency other than for compliance with the minimum procedural requirements that it contain the name, address and signature of the complainant, and counsel if represented by counsel, the name and address of each accused respondent and "the particulars of the violation." Rule 6.3.

The Putnam complaint in this case makes generalized allegations against the plaintiffs as a group, alleging violations in a conclusory manner. Section 9(2)(c) permits the complainant to obtain subpoenas. The subpoena issued to each of the plaintiffs as named respondents dated July 12, 2006, required production as previously set forth. That such production was burdensome and beyond the disclosure requirements of the campaign finance law are obvious.

On July 21, 2006, Hopkins sent a letter to all of the respondents forwarding a "non-negotiable offer of settlement," demanding a reply before setting a date for an ALJ

Hearing.  Exhibit 11.  The offer was to sign a "Stipulation and Guilty Plea," reading as

follows:

> The undersigned Respondents, collectively and individually, jointly
> and severally, plead guilty to all charges and stipulate to this Court as
> follows:
>
> The undersigned, individually and collectively, Tom Sorg, Norman
> Feck, Louise Schiller, Karen Sampson, Wes Cornwell, Becky Cornwell,
> and Wes Cornwell as Agent and President of Sundance Printing, under
> penalty of perjury, do hereby declare and swear that:
>
> 1. We are individually and collectively the Respondents named
>    in case OS 2006-0013 of the Colorado Administrative
>    Courts, before the Colorado Secretary of State.
> 2. That we individually and collectively affirm we are GUILTY of
>    all charges alleged against us in said action OS 2006-0013.
> 3. That we will ensure, individually and collectively, that we are
>    in compliance with the law before July 28, 2006 by either
>    registering the issue committee and following the procedures
>    and law required of a committee or abandoning our group of
>    two or more persons who oppose the Parker North
>    Annexation and removing all signs and campaign material
>    derived from such group from sight.
> 4. That we will, individually and collectively, compile all
>    documents required of the law and serve them on the
>    Complainant, the Colorado Secretary of State, and this Court
>    before August 4, 2006 or before that date we will serve the
>    Complainant and this Court with a collective, unanimous
>    sworn statement abandoning our group of two or more
>    persons who oppose the Parker North Annexation and
>    further attesting under penalty of perjury that we have
>    removed from sight all signs and campaign material derived
>    from such group.
> 5. That if I and we, individually and collectively, failed to abide
>    by the law and/or this stipulation, I and we agree to suffer all
>    sanctions of this, of any, Court, tribunal or administrative
>    proceeding to be imposed against each undersigned,
>    personally, individually and collectively, jointly and severally.

6.     If we all sign and agree and if we fully comply with this stipulation and the law, the complainant will dismiss without prejudice action OS 2006-0013.

The coercive nature of this demand is self evident.

After the administrative complaint was resolved by the Stipulation and Entry of Judgment on September 20, 2006, Putnam and Hopkins distributed a two page document to all Parker North residents, improperly characterizing the stipulation as a court ruling that the plaintiffs were guilty of law violations and were trying to hide their identities and activities.  Exhibit 16.

The apparent purpose of Hopkins and Putnam in filing and pursuing the complaint was to intimidate the plaintiffs, forcing them to stop their efforts to oppose the annexation and to influence the outcome of an election by an implied threat that other opponents would be joined as respondents.  By permitting this intimidation, Colorado's campaign finance laws had the effect of stifling political speech in violation of the First Amendment as it was applied to these plaintiffs.  The fact that the plaintiffs continued their opposition despite the proceedings against them does not excuse or cure the violation.  They were adversely affected by the need to defend themselves, incurring the expense of hiring a lawyer to help them and being publicly accused as violators of state law.

When government attempts to regulate the content of speech, the Supreme Court has clearly and consistently directed the courts to apply a standard of strict scrutiny to determine whether the collective interest to be served is compelling and

whether the regulation is narrowly tailored to promote that interest.  If a less restrictive alternative would serve that purpose, it must be used.  *U.S. v. Playboy Enter. Group, Inc.,* 529 U.S. 803 (2000); *Utah Educ. Ass'n v. Shurtleff,* 512 F.3d 1254 (10th Cir. 2008). If government imposes restrictions on the time, place and manner of speech or expressive conduct, the Court gives greater deference to political policy choices by using a lower level of scrutiny to determine if the restriction is neutral as to content, narrowly tailored and leaving open ample alternative channels for communication. *Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *Citizens for Peace in Space v. City of Colorado Springs,* 477 F.3d 1212 (10th Cir. 2007).

In addressing the conflicting interests involving the freedoms of speech and assembly in the electoral process cases, the Court has not provided any clear formulaic analysis.  In *Buckley*, the federal statute limiting contributions was said to have "little direct restraint" on speech but presented a danger of infringement on the contributor's freedom of association making them subject to "exacting scrutiny" to see if they are "closely drawn" to match a "sufficiently important interest."  *Buckley, supra* at 24-25. When a regulation limits campaign expenditures, the Court has expressed more concern with the effects on the quantity and quality of core political speech by examining the restriction with "exacting scrutiny" to see if it is "narrowly tailored" to promote a "compelling state interest."  *Buckley, supra*; Federal *Elect. Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986).

The confusion of linguistics in addressing the First Amendment issues raised by campaign finance laws is best illustrated by the Court's rulings on challenges to the Bipartisan Campaign Reform Act of 2002 in *McConnell v. Federal Elect. Comm'n,* 540 U.S. 93 (2003). There, seven justices wrote eight opinions with varying alliances, affirming in part and reversing in part the rulings of a three-judge district court in a *per curiam* opinion with four separate authored opinions occupying 774 pages of a volume in West's Federal Supplement 2d Series. *McConnell v. Federal Elect. Comm'n,* 251 F. Supp. 2d 176 (D.D.C. 2003).

The common thread in campaign finance legislation and litigation is the noble notion that to prevent corruption and the appearance of corruption of candidates for office and the process by which they are elected, there must be some restrictions on First Amendment freedoms. Thus, elected public officials should be free from the influence of special interests having sufficient financial resources to pander to them as candidates for their elected offices; those with great wealth should not be able to influence elections and transparency is essential to the integrity of the electoral process.

When public policy is determined by direct citizen participation through the electoral process, avoidance of the potential for corruption of office-holders is of less importance than the transparency that may be served by identification of the proponents and opponents of the measure under consideration. That information may be of considerable importance to the voting public in analyzing the reasons for approval or disapproval of the question presented on their ballot and the anticipated effects of its

adoption.

That concern has some relevance to an annexation election. The registration and reporting requirements of Colorado's campaign finance laws serve that governmental purpose during the election process–that is after the notice of election. While it may be desirable to have such information at an earlier stage of the statutory annexation process, there is no support for finding that this purpose would be served by restricting the First Amendment freedoms of the plaintiffs and the other residents and landowners of Parker North in attempting to persuade the Town Council to reject the petition for an annexation election. As earlier observed, the findings and conclusions to be made when a petition for an annexation election is filed are the same as those required to be made by a petition for annexation by ordinance. The state law does not apply to restrict the speech and activities of those who seek to persuade the governing authority to reject a petition for annexation. There is no justification for any restriction on those opposing a petition requesting the Town Council to proceed with an annexation election. Speech addressed to the Town Council as elected representatives of the Town of Parker is different from speech addressing the qualified electors and landowners in Parker North in the election process.

The Supreme Court has considered limits on contributions to groups formed to support ballot measures as having a greater impact on First Amendment freedoms than restrictions in candidate campaigns. *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290 (1981). The Court recognized that in the context of elections, the right of

association and the right of expression overlap and blend together.  Using exacting judicial scrutiny, the Court found that a $250.00 limit on contributions to an unincorporated association formed to oppose a rent control initiative was unconstitutional.  The Court relied, in part, on its earlier opinion in *First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978), invalidating a criminal statute forbidding corporate expenditures and contributions to publicize opposition to a referendum on a measure permitting an individual income tax.  In both cases, the Court rejected the risk of corruption as a justification for the restriction, saying that such a risk in candidate elections is not present in a popular vote on a public issue.

In *Berkeley*, the Court observed that the integrity of the political system will be adequately protected if contributors and the amounts contributed are identified in a public filing.  That dicta suggests that Colorado's disclosure requirements may be valid when they are applied to this annexation election called by the election commissioners.

The plaintiffs have argued that there is a right of anonymity in the process and that publication of the names and employment of contributors will inhibit some persons from making contributions.  Additionally, these disclosures are said to contravene the purpose of a secret ballot.  The latter argument is not persuasive.  The freedom of expression and association of participants in the electoral process presupposes an individual's interest in publicly advocating support or opposition to a ballot measure.

That is separate and apart from ballot secrecy. The right of advocacy and the right to vote are separate rights.

In *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995), the Court held that an Ohio statute prohibiting anonymous campaign literature was unconstitutional as it applied to an individual distributing a leaflet opposing an imminent referendum on a proposed school tax levy without complying with the statute's requirement that the publication contain the name and residence of the person responsible for it. In its ruling, the Court emphasized that this content requirement impinged upon the individual's freedom of speech. In so doing, Justice Stevens found that an author's decision to remain anonymous, like other content of a publication, is within the protection of the First Amendment and within the tradition of anonymity in the advocacy of a political cause. The opinion is not controlling here because the Court limited its holding to the individual's freedom of expression and considered disclosure of her identity as a specific content requirement. It did not address the question presented in this case – whether the state may require disclosure of the names of contributors to a group effort to influence the outcome of an annexation election.

The extent of the burdensome effects of the reporting and disclosure requirements on the plaintiffs' speech and freedom of association after the campaign finance laws became applicable–that is, after the notice of election–appears to present a factual dispute–as does the justification for those requirements. The cases cited do not clearly address the allocation of the burden of persuasion on those issues.

The plaintiffs must demonstrate that there are sufficient adverse effects to warrant some level of scrutiny.  The defendant must come forward with its justifications.  The balancing of the competing interests then is a mixed question of fact and law.  In this case the parties rely principally on the opinions of those they have claimed to have sufficient expertise to express opinions under F.R.E. 702.  The plaintiffs submitted the results of a research survey conducted by Dr. Jeffrey Milyo, a professor at the University of Missouri, to support his opinions concerning the complexity of Colorado's laws, the weakness of the anti-corruption rationale for them and the difficulties in compliance.  In addition, Dr. Dick Carpenter, an assistant professor at the University of Colorado, Colorado Springs, conducted two research projects to assess the costs and effects of campaign finance disclosure requirements and the collection and analysis of sources of information available to Colorado voters during the 2006 general election cycle concerning the ballot questions presented.  The conclusions of these two professors are challenged both as to the methodology employed and the opinions stated.

The defendant offers the opinions of Robert Stern and Dr. Daniel A. Smith, criticizing the reports submitted by the plaintiffs, and a journalist, Floyd Ciruli, who comments from his experience in observing elections in Colorado.  Understandably, he has emphasized the importance of disclosure to those who seek to influence public opinions by their reporting and commentary in the news media.  The parties have suggested that these disputes should be determined by a jury.

The surveys and experiments of the plaintiffs' opinion witnesses are not a sufficient support for their opinions. There is no scientific method that can measure the adverse effects claimed by the plaintiffs. The defendants' witnesses offer no better support for their opinions.

No trial is necessary in this case because this court has limited this case to an as applied challenge to these laws requiring the formation of an issue committee and the reporting of contributions and expenditures in the election to determine the annexation of Parker North to the Town of Parker. There are no disputed facts that are material to these questions.

As discussed above, the requirements did not become applicable to these plaintiffs before the notice of election. If that legal analysis is incorrect, any prior application is unconstitutional on a number of grounds. First, the law is vague and indefinite as to when it became applicable. As the Secretary reads it, Putnam and Hopkins should have formed an issue committee when they began to circulate the second petition for annexation and expended or accepted funds. It is telling that they did not register the ParkerYes committee until months later. There can be no doubt that Putnam and Hopkins used the private enforcement provisions to attempt to silence the plaintiffs by the filing of the complaint in July. That is clear from their demand for a confession and the implied threat that anyone who opposed the annexation may find themselves responding to a complaint against them.

While the practicalities of law enforcement require the courts to indulge the fiction that all of us are presumed to know the law, the uncertainty as to when the residents of a neighborhood with a common interest in protecting their property from annexation must formally organize as an issue committee makes that assumption so unrealistic as to warrant its rejection in this case.  No reasonable person would believe that simply sharing their views with neighbors and expressing them in the manner shown in this case would result in their being hauled before an administrative law judge to defend themselves against general accusations of law violations and be exposed to monetary penalties and publicly condemned as law violators.

The record presented in the papers filed in this case support the plaintiffs' claims that their First Amendment rights were violated when they felt compelled to enter into the Stipulated Judgment to avoid the cost of continuing to defend themselves in the ALJ proceedings.

The policy justifications supporting registration and reporting as an issue committee – protecting the integrity of the electoral process by ensuring transparency of organized opposition –  could not begin before there was an identified electorate and a ballot question.  As explained earlier, this annexation issue did not become a matter affecting an electorate before the notice of election.  That notice defined the question and the publication defining the metes and bounds of the area to be annexed determined who constituted the electorate.  That differs from the formation of issue

committees for and against a ballot issue to be submitted at a general election as was the case in *Colorado For Family Values, supra.*

The plaintiffs' challenge to the law and regulations must be analyzed differently for its applicability after the notice of election. There are some concerns as to what constitutes a contribution and an expenditure other than money but they are not presented in this case. There are also concerns about the low threshold for reporting as being tailored to the governmental purpose of transparency in the electoral process but it cannot be said to be so onerous as to be unconstitutional as beyond a legitimate policy determination made by the voters on the citizen initiative for the adoption of Article XXVIII of the Colorado Constitution. The constitutionality of the procedure following a citizen complaint in an election that is within coverage of the Colorado Constitution, statutes and regulations is not an issue that can be determined on this record, given the termination of the ALJ proceeding in this case by settlement.

Upon the foregoing, it is

ORDERED and ADJUDGED that Article XXVIII and the Colorado Campaign Finance Law had no applicability to the plaintiffs' activities before publication of the Notice of Annexation Election on December 14, 2006.

IT IS FURTHER ORDERED AND ADJUDGED that if the registration and reporting requirements of those laws were applicable before December 14, 2006, their applicability infringed the protections of the plaintiffs' freedoms guaranteed by the First Amendment to the United States Constitution.

IT IS FURTHER ORDERED AND ADJUDGED the governmental interest in protecting the integrity of the election process for the North Parker annexation by the application of the issue committee requirements to the plaintiffs during the election process beginning with the publication of the Notice of Election on December 14, 2006 is sufficient to outweigh the plaintiffs' First Amendment protection.  To that extent the plaintiffs' claim of constitutional invalidity is denied.

IT IS FURTHER ORDERED AND ADJUDGED the plaintiffs have substantially prevailed in this action warranting recovery of attorney's fees under 42 U.S.C. § 1988. The clerk shall enter judgment accordingly.


DATED: September 18, 2008

                                   BY THE COURT:

                                   s/Richard P. Matsch

                                   _____

                                   Richard P. Matsch, Senior District Judge